UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RAFAEL GONZALEZ-CRUZ,

                Plaintiff,

      v.

COMMISSIONER OF SOCIAL SECURITY,

               Defendant.

_____

<u>DECISION & ORDER</u>

16-CV-6613P


## <u>PRELIMINARY STATEMENT</u>

Plaintiff Rafael Gonzalez-Cruz ("Gonzalez-Cruz") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Supplemental Security Income ("SSI"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 9).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 12, 14). For the reasons set forth below, I hereby vacate the decision of the Commissioner and remand this claim for further fact-finding at step five to be completed and a decision rendered within 120 days of the issuance of this Decision and Order. If the ALJ's subsequent decision results in a denial of benefits, a final decision of the Commissioner must be rendered within 60 days of Gonzalez-Cruz's appeal of that decision, if any.

**BACKGROUND**

I.      **Procedural Background**

Gonzalez-Cruz protectively filed for SSI on July 13, 2010, alleging disability beginning on October 31, 2006, due to major depressive disorder, panic disorder without agoraphobia, schizophrenia, polysubstance abuse in sustained remission, alcohol abuse, mild mental retardation, heart disease, and high blood pressure. (Tr. 329, 333).[1] On September 30, 2010, the Social Security Administration denied Gonzalez-Cruz's claims for benefits, finding that he was not disabled. (Tr. 75-76). Gonzalez-Cruz requested and was granted a hearing before Administrative Law Judge Lawrence Levey (the "ALJ"). (Tr. 101, 135-40). The ALJ conducted a hearing on September 20, 2011, but Gonzalez-Cruz failed to attend. (Tr. 49-54). Accordingly, the ALJ issued an order dismissing the request for a hearing. (Tr. 83-85).

On December 13, 2012, the Appeals Council remanded the matter for further proceedings, concluding that Gonzalez-Cruz had a good reason for not appearing at the hearing. (Tr. 91-93). According to the Appeals Council, the record demonstrated that Gonzalez-Cruz was Spanish-speaking, could not read or write in English or Spanish, had a limited education, had an IQ score of 61, and had been diagnosed with mild mental retardation, major depressive disorder, panic disorder, schizophrenia, and substance abuse. (*Id.*). Thus, the Appeals Council concluded that Gonzalez-Cruz might not have understood the procedures or the consequences of failing to appear for the hearing. (*Id.*). The Appeals Council instructed the ALJ to schedule another hearing and to obtain additional evidence relating to Gonzalez-Cruz's cognitive impairments, including, if warranted and available, an examination by a Spanish-speaking physician for IQ

---

[1] The administrative transcript shall be referred to as "Tr. __."

and psychological testing in Spanish and corresponding medical source statements concerning Gonzalez-Cruz's capabilities. (*Id.*).

The ALJ held another hearing on July 29, 2014. (Tr. 55-74). Gonzalez-Cruz was represented at the hearing by Doris M. Cortes, a non-attorney representative. (Tr. 55, 259). In a decision dated September 24, 2014, the ALJ found that Gonzalez-Cruz was not disabled and was not entitled to benefits. (Tr. 12-35).

On July 11, 2016, the Appeals Council denied Gonzalez-Cruz's request for review of the ALJ's decision. (Tr. 1-5). Gonzalez-Cruz commenced this action on September 7, 2016, seeking review of the Commissioner's decision. (Docket # 1).

## II. Relevant Medical Evidence[2]

### A. Medical Records

#### 1. Huther-Doyle Treatment Program

On April 27, 2009, Yisenia Rivera, BA, CASAC, completed a psychosocial assessment of Gonzalez-Cruz as part of an intake evaluation for a chemical dependency program at Huther-Doyle. (Tr. 460-79). Gonzalez-Cruz reported that he had begun using cocaine and heroin as a teenager and had last used heroin earlier that month. (*Id.*). He was participating in a methadone chemical dependency treatment program at Strong Recovery. (*Id.*). Gonzalez-Cruz reported previous attempts at chemical dependency treatment and that his use of alcohol had increased during his periods of attempted heroin abstinence. (*Id.*).

Gonzalez-Cruz reported limited education and indicated that his father removed him from school in kindergarten. (*Id.*). He reported that his father was an alcoholic and

---

[2] Those portions of the treatment records that are relevant to this decision are recounted herein.

physically abusive. (*Id.*). Gonzalez-Cruz reported witnessing the deaths of several close family members and friends, including the suicide of his uncle and the murder of his close friend. (*Id.*). Gonzalez-Cruz had been in a relationship with his girlfriend for the previous three years. (*Id.*).

Gonzalez-Cruz reported a history of depression and anxiety, and he presented as anxious with average intelligence. (*Id.*). He also reported suffering from both audio and visual hallucinations. (*Id.*). He was admitted to the alcohol and substance abuse treatment program. (*Id.*).

Gonzalez-Cruz successfully completed the program and was discharged on April 15, 2010. (Tr. 457-59). During his participation in the program, Gonzalez-Cruz suffered several relapses, resulting in the loss of his methadone "take outs." (*Id.*). He recommitted to recovery, and his last reported use of alcohol was February 2010. (*Id.*). He was advised to continue engagement with the Strong methadone program and to continue with treatment at Strong Mental Health. (*Id.*).

## 2. **Strong Behavioral Health**

Treatment notes indicate that Gonzalez-Cruz began receiving mental health treatment at Strong Behavioral Health in 2006. (Tr. 400). He attended individual therapy sessions with Leticia Ruiz ("Ruiz"), LMSW, approximately once a month and attended medication management appointments with Telva Olivares ("Olivares"), MD. (Tr. 395-406, 573-84). During his sessions with Ruiz, Gonzalez-Cruz generally presented as depressed and anxious, with fair concentration and intact memory. (*Id.*). In general, Gonzalez-Cruz reported ongoing compliance with his medications and chemical dependency treatment. (*Id.*). According to Gonzalez-Cruz, his medications were helpful in addressing his mental health impairments, including better sleep and decreased anxiety. (*Id.*). He also reported experiencing stress as a

result of his girlfriend's son's involvement in PINS and Juvenile Delinquency proceedings. (*Id.*). Gonzalez-Cruz also discussed stress relating to his attempts to obtain SSI benefits and one instance of alcohol relapse. (*Id.*). The treatment notes also reflect several missed appointments, apparently due to transportation issues. (*Id.*).

In May 2010, Gonzalez-Cruz attended an appointment with Olivares. (Tr. 399-400). He reported that he was doing well and was tolerating his medications. (*Id.*). He reported that he was "working under the table" and was applying for SSI benefits. (*Id.*). With respect to the benefits application, Gonzalez-Cruz stated, "I'm going to try, why not." (*Id.*). Olivares discussed with Gonzalez-Cruz the value of work and advised him to consider going to work, even if part-time. (*Id.*). Olivares's mental health status examination reflected essentially normal findings, although she noted that Gonzalez-Cruz's motor activity baseline was "a bit hyper." (*Id.*). According to Olivares, Gonzalez-Cruz demonstrated a euthymic mood, good concentration and insight, and intact memory. (*Id.*). Olivares noted that Gonzalez-Cruz's primary complaint was difficulty sleeping, although he occasionally reported feeling depressed. (*Id.*). Olivares recommended that Gonzalez-Cruz continue with his current medication regimen. (*Id.*).

Gonzalez-Cruz met with Olivares again in October 2010. (Tr. 581-82). He presented as very hyperactive, with poor concentration. (*Id.*). Gonzalez-Cruz reported that he had been denied SSI benefits and had no more refills for his medication. (*Id.*). Olivares noted that Gonzalez-Cruz should not be out of refills and questioned whether he was abusing or selling his medication. (*Id.*). She also noted that despite Gonzalez-Cruz's hyperactivity, he denied that he was using any drugs. (*Id.*). Additionally, Olivares reported that Gonzalez-Cruz had missed a

number of appointments, despite reporting daily to the same location for methadone maintenance. (*Id.*). She continued Gonzalez-Cruz's medication regimen. (*Id.*).

A treatment plan formulated by Ruiz in October 2010 indicated that Gonzalez-Cruz had been diagnosed with depressive disorder, not otherwise specified, opioid dependence, and a learning disorder. (Tr. 579-80). She assessed a Global Assessment of Functioning ("GAF") of 60 and noted that Gonzalez-Cruz was illiterate. (*Id.*). She recommended that Gonzalez-Cruz continue to receive mental health treatment and attempt to improve his attendance at appointments. (*Id.*). She also recommended that he continue to attend the methadone treatment program at Strong. (*Id.*).

Throughout 2011, Gonzalez-Cruz continued to meet with Ruiz approximately twice a month and with Olivares approximately once every three months. (Tr. 516-70). Gonzalez-Cruz continued to demonstrate a depressed and anxious mood, fair concentration, intact memory, and appropriate affect. (*Id.*). His sessions generally involved discussing home stressors, including his relationship with his girlfriend and her son. (*Id.*). He also discussed his attempts to obtain SSI benefits. (*Id.*).

In March 2011, Gonzalez-Cruz reported that he was permitted to take home his prescribed methadone. (*Id.*). He also reported that his medication assisted his sleep and decreased his symptoms of anxiety and depression. (*Id.*). Gonzalez-Cruz told Olivares that he had been denied SSI benefits. (*Id.*). Olivares opined that Gonzalez-Cruz was capable of working, that he was "very resourceful at baseline," and could possibly make more money by working than he would by receiving benefits. (*Id.*).

In May 2011, Gonzalez-Cruz broke up with his girlfriend, although he continued to maintain contact with her. (*Id.*). During a June 2011 evaluation, Ruiz assessed that

Gonzalez-Cruz's mood was depressed and anxious, but that he demonstrated fair concentration, intact memory, and average intelligence. (*Id.*). He reported to Olivares that he had been working under the table washing cars. (*Id.*). He also reported that he had broken up with his girlfriend due to her difficulty with her teenage son. (*Id.*). Gonzalez-Cruz worried that the stress from those difficulties would cause him to relapse. (*Id.*).

In August 2011, Gonzalez-Cruz reported that his girlfriend had moved to Massachusetts and that he had lost his methadone take-home privileges due to missed appointments. (*Id.*). According to Gonzalez-Cruz, the stress caused by his girlfriend's relocation caused him to relapse and he had been ordered to chemical dependency treatment. (*Id.*). Throughout the remainder of 2011, Gonzalez-Cruz reported ongoing communication with his ex-girlfriend and that he spent time with friends during holidays. (*Id.*).

During 2012, Gonzalez-Cruz continued his mental health treatment at Strong Behavioral Health. (Tr. 498-515, 662-721). He continued to have medication management appointments approximately every two months, at first with Olivares and then with Patricia Mangarelli ("Mangarelli"), NP. (*Id.*). He also continued to attend individual therapy sessions with Ruiz, although his attendance was more sporadic, sometimes seeing her only once a month or every other month. (*Id.*).

In early 2012, Gonzalez-Cruz reported difficulty sleeping and that he was unable to fill his prescriptions because he could not afford the copayments. (*Id.*). He also discussed ongoing financial stressors and difficulty in his relationship with his girlfriend in Massachusetts. (*Id.*). His mental status examinations continued to be generally normal, although he continued to demonstrate a depressed and anxious mood during therapy sessions. (*Id.*).

In June 2012, Gonzalez-Cruz informed Ruiz that he had not been attending sessions because he had been dealing with several issues and had not been motivated to attend. (*Id.*). He reported that he had been discharged from the Strong Recovery Chemical Dependency program, but continued to attend the methadone program. (*Id.*). He reported that he might lose his benefits from the Department of Health and Human Services and that he had a new girlfriend, who was living with him. (*Id.*).

In July 2012, Gonzalez-Cruz met with Mangarelli for a medication management appointment. (*Id.*). He reported that he might be evicted, that his services had been suspended, and that he had not been attending appointments due to transportation issues. (*Id.*). A mental health status examination was largely normal, with full range affect, euthymic mood, normal concentration, intact memory, and average intelligence. (*Id.*). He met with Mangarelli again in September 2012 and reported that he was sleeping well and that there was no need to increase his Seroquel dosage. (*Id.*).

Gonzalez-Cruz met with Ruiz in September and November 2012 and reported that his Department of Health and Human Services case had been closed and that he had been living in an apartment with no electricity or heat. (*Id.*). He continued his relationship with his girlfriend and continued to attend the methadone program and a chemical dependency program at Restart. (*Id.*). Throughout the remainder of 2012, Gonzalez-Cruz reported that he was homeless and was staying with a friend. (*Id.*). He continued to demonstrate largely normal mental status findings upon examination and reported that he had been working. (*Id.*).

Gonzalez-Cruz's attendance at his mental health treatment appointments became more sporadic in 2013. (Tr. 724-36, 811-31). He met with Ruiz in January and presented with a sad affect, anxious and depressed mood, fair concentration, intact memory, and average

intelligence. (*Id.*). He reported that he continued to be homeless and was staying with a friend. (*Id.*). His living situation caused him concern because his friend used drugs and he was worried he might be arrested in a drug raid. (*Id.*). He continued his relationship with his girlfriend, abstained from drugs and alcohol, and attended his methadone and chemical dependency programs. (*Id.*).

Gonzalez-Cruz met with Mangarelli in February 2013 and reported that he had found a new apartment, was living alone, and had obtained vouchers for furniture. (*Id.*). His mental status was generally normal, with a full range and happy affect and a euthymic mood. (*Id.*). In May 2013, Gonzalez-Cruz met with Ruiz and reported ongoing maintenance and infestation issues at his residence. (*Id.*). He reported some anxiety about his girlfriend's possible reaction to his ex-girlfriend's return to the area. (*Id.*). He also reported that he continued to attend his treatment programs and to abstain from drugs and alcohol. (*Id.*). In June 2013, Gonzalez-Cruz reported to Ruiz that he had been settling into his apartment and had obtained a refrigerator. (*Id.*). He presented with a sad affect and an anxious and depressed mood, and reported that he continued to participate in his treatment programs. (*Id.*). Ruiz advised him that it was important to comply with Department of Health and Human Services requirements so that he could avoid having his case closed and a disruption in his living situation. (*Id.*).

There do not appear to be any additional treatment records until May 2014, when Gonzalez-Cruz attended an appointment with Mangarelli. (Tr. 820-23). During that appointment, he presented with a full range and happy affect, euthymic mood, intact memory, average intelligence, intact judgment, fair insight, and fair judgment. (*Id.*). He reported doing well overall and that he was living in his own apartment. (*Id.*).

3. **Strong Recovery**

Although the record suggests that Gonzalez-Cruz received long-standing treatment from the Methadone Maintenance Program at Strong Recovery, the first treatment plan in the record is dated August 10, 2010. (Tr. 660-61). According to the treatment plan, Gonzalez-Cruz had been diagnosed with opioid dependence, alcohol dependence, cocaine dependence, cannabis abuse, hallucinogen abuse, inhalant abuse, adjustment disorder with mixed anxiety and depression, and a learning disorder, not otherwise specified. (*Id.*). Gonzalez-Cruz was in full sustained remission for the diagnoses relating to cocaine, cannabis, hallucinogens, and inhalants, early partial remission for the alcohol dependence diagnosis, and early full remission for the opioid dependence. (*Id.*). He was assessed a GAF of 55 and noted to have limited sober support, limited education, limited finances, and a language barrier. (*Id.*). The treatment records suggest that Gonzalez-Cruz had difficulty attending his individual appointments. (*Id.*). His treatment plan required him to meet with Maria S. Baronov ("Baronov"), MS, MHC, CASAC, once a month and to attend methadone dispensing six times a week. (*Id.*). This treatment plan was updated on November 8, 2010 with no significant changes. (Tr. 656-57).

Treatment notes demonstrate that Gonzalez-Cruz met with Baronov in October and November 2010. (Tr. 655, 658-59). During those meetings, Gonzalez-Cruz expressed frustration with the need to meet monthly instead of just "pop[ping]" in as needed. (*Id.*). Baronov explained that the meetings were necessary to assist him to stop consuming alcohol. (*Id.*). According to Baronov, although the methadone treatment was successful in helping Gonzalez-Cruz abstain from heroin use, he continued to use alcohol. (*Id.*). Gonzalez-Cruz

informed Baronov that he occasionally worked in order to help pay household bills and helped his girlfriend with household chores.  (*Id.*).

Treatment records suggest that Gonzalez-Cruz's treatment plan was updated twice in 2011 with minimal changes.  (Tr. 646-47, 650-51).  In his April 2011 treatment plan, he was assessed an increased GAF of 58.  (*Id.*).  During the early part of 2011, Gonzalez-Cruz attended monthly sessions with Baronov.  (Tr. 643-54).  During the sessions, they discussed working towards a goal of permitting Gonzalez-Cruz to take home doses of methadone so he did not have to go to the clinic daily.  (*Id.*).  In April 2011, Gonzalez-Cruz reported that he was working "a lot," primarily painting in a workshop near his residence.  (*Id.*).  He also indicated that his methadone dosage was too low.  (*Id.*).  He requested that his dose be increased by five milligrams.  (*Id.*).

In June 2011, Gonzalez-Cruz met with Itza Morales-Torres ("Morales-Torres"), BA, CASAC-T, for an individual session.  (Tr. 642).  Gonzalez-Cruz reported that he had consumed alcohol after breaking up with his girlfriend.  (*Id.*).  Morales-Torres offered to have Gonzalez-Cruz enrolled in outpatient chemical dependency group treatment, but Gonzalez-Cruz indicated that his alcohol use was an isolated relapse.  (*Id.*).  He met with Morales-Torres again in August and reported that he had only consumed alcohol on two occasions.  (Tr. 641). According to Gonzalez-Cruz, he was feeling lonely after ending his relationship with his girlfriend, who was moving to Massachusetts.  (*Id.*).  Gonzalez-Cruz expressed interest in participating in group treatment programs at Strong Recovery, and Morales-Torres arranged an appointment for him.  (*Id.*).

On August 30, 2011, Gonzalez-Cruz participated in an intake assessment for the Chemical Dependency program at Strong Recovery with Morales-Torres and Matthew Tessena

("Tessena"), MD. (Tr. 634-40). During the assessment, Gonzalez-Cruz reported that he had been drinking four or five forty-ounce beers every day. (*Id.*). He indicated that he had nineteen siblings and had been raised by his paternal grandmother, who had died when he was seventeen. (*Id.*). He reported that he had never been a victim or perpetrator of sexual abuse and that he had no formal schooling. (*Id.*). A mental health status examination was essentially normal, with full range affect, euthymic mood, intact memory, and good capacity for activities of daily living. (*Id.*). Gonzalez-Cruz demonstrated below average intelligence, impaired judgment, and poor impulse control. (*Id.*). He was assessed a GAF of 41, and Morales-Torres and Tessena indicated that he would benefit from inpatient rehabilitation care, but was not a candidate because he spoke only Spanish and was enrolled in a methadone program. (*Id.*). He was referred to the Strong Recovery Chemical Dependency program under the care of Baronov, and Tessena planned to prescribe Campral to assist with alcohol abstinence. (*Id.*).

Gonzalez-Cruz met with Baronov, Morales-Torres and Tessena several times in October 2011. (Tr. 619, 620-22, 626, 629-30). During those sessions, Gonzalez-Cruz indicated feelings of loneliness since his girlfriend's departure. (*Id.*). Gonzalez-Cruz indicated that he was unable to stop consuming alcohol without assistance. (*Id.*). He was counseled about the dangers of consuming alcohol while taking methadone, and Tessena prescribed Campral to decrease his urge to drink alcohol. (*Id.*). Once he started the medication, Gonzalez-Cruz reportedly abstained from consuming alcohol, although he continued to experience the urge to drink. (*Id.*). Due to his illiteracy, he also requested assistance in completing an address verification for the sex offender registry. (*Id.*).

In December 2011, Gonzalez-Cruz informed Morales-Torres that he wanted to wean his methadone dosage with the goal of discontinuing the program. (Tr. 612-13).

Gonzalez-Cruz admitted that his desire to stop participating in the program was related to his continued drinking, although he also expressed a desire to be free from methadone dependence. (*Id.*). Morales-Torres advised him of the danger of consuming both alcohol and methadone and the pros and cons of continuing in the methadone program. (*Id.*). She noted that Gonzalez-Cruz was at high risk for relapsing on all substances due to his poor insight and poor coping skills. (*Id.*).

Morales-Torres and Baronov each updated Gonzalez-Cruz's treatment plan in early January 2012. (Tr. 606-11). Each noted that Gonzalez-Cruz admitted to continued alcohol consumption and that he was not taking Campral as prescribed. (*Id.*). Morales-Torres noted that referral to a higher level of care was difficult because Gonzalez-Cruz was Spanish-speaking and had limited cognitive abilities. (*Id.*). Baronov indicated that Gonzalez-Cruz reported that he continued to work "under the table" and had met some friends through his employment. (*Id.*). These treatment plans were updated in April 2012 with no significant changes. (Tr. 591-97).

During January and February of 2012, Gonzalez-Cruz met with both Baronov and Morales-Torres. (Tr. 601-05). He reported that he was taking Campral as prescribed and had abstained from alcohol since December 2011. (*Id.*). He reported that he had stayed busy with side jobs to earn money, collecting bottles and cans to return for cash, and assisting a friend who was a mechanic. (*Id.*). Gonzalez-Cruz told Morales-Torres that he wanted to discontinue weaning from methadone and wanted to treat with a male provider. (*Id.*).

On February 22, 2012, Morales-Torres transferred Gonzalez-Cruz's methadone maintenance care to Rafael Arzuaga ("Arzuaga"), BA, CASACT. (Tr. 601-02). At the time of the transfer, Morales-Torres assessed that Gonzalez-Cruz had a GAF of 60 and noted that he continued to be enrolled in chemical dependency groups with Baronov. (*Id.*). She indicated that

Gonzalez-Cruz suffered from some cognitive impairments, but nevertheless seemed to be "high functioning." (*Id.*). Morales-Torres also reported that he would need occasional assistance to complete paperwork for DSS, SSI, and/or sex offender registration. (*Id.*).

Gonzalez-Cruz met with both Baronov and Arzuaga in March and April 2012. (Tr. 587-90, 598-600). He reported that he continued to work under the table and to spend time at his residence. (*Id.*). According to Gonzalez-Cruz, his ex-girlfriend had informed him that she was dating someone else, which caused him to consume three beers. (*Id.*). He also indicated that he had plumbing problems in his apartment that he had attempted to fix, but had been unable to because he did not have the necessary parts. (*Id.*). On April 19, 2012, Gonzalez-Cruz was discharged from the chemical dependency program at Strong Recovery due to his failure to comply with program regulations, particularly the attendance requirements. (*Id.*). Gonzalez-Cruz indicated that he would pursue chemical dependency treatment through Catholic Family Charities Restart Substance Abuse Program. (*Id.*).

Gonzalez-Cruz continued to meet with Arzuaga through the remainder of 2012. (Tr. 663-64, 677, 686, 696, 710). During those meetings, Gonzalez-Cruz generally reported abstaining from drugs and alcohol, participating in chemical dependency treatment and mental health appointments, and performing "odd" or "side" jobs, including washing cars. (*Id.*). Gonzalez-Cruz's attendance at monthly appointments with Arzuaga was more sporadic in 2013, with several missed appointments. (Tr. 727, 810, 818). When Gonzalez-Cruz did meet with Arzuaga, he reported ongoing participation in chemical dependency and mental health treatment. (Tr. 729, 738, 811).

### 4.    Catholic Charities of Rochester

Gonzalez-Cruz began treatment with the Restart Program at Catholic Charities of Rochester in May 2012.  (Tr. 848-954).  Initially, Gonzalez-Cruz attended group therapy three times a week and individual therapy sessions with Damaris Felix ("Felix") twice a month.  (*Id.*).  In August 2012, Gonzalez-Cruz reported that he relapsed by smoking cannabis.  (*Id.*).  Throughout 2012, his therapists noted that his attendance was variable, likely due to his unstable housing situation.  (*Id.*).  In October 2012, Gonzalez-Cruz reported that he was living in an apartment without heat or electricity.  (*Id.*).  That same month, his individual therapy sessions were transferred to Omayra Rivera ("Rivera"), and he reported that his sister was in critical condition at the hospital.  (*Id.*).

In November 2012, Gonzalez-Cruz reported that his father had been abusive and had removed him from school when he was five years old.  (*Id.*).  Gonzalez-Cruz continued to live in an apartment with no heat or electricity and was making repairs to the apartment in exchange for rent.  (*Id.*).  In December 2012, Gonzalez-Cruz disclosed that his father had physically and sexually abused him.  (*Id.*).  He also reported relapsing by consuming two beers.  (*Id.*).  According to Gonzalez-Cruz, he continued to be homeless, which depressed him.  (*Id.*).

Gonzalez-Cruz continued attending group and individual therapy sessions throughout 2013.  (*Id.*).  He experienced several relapses throughout 2013, including drinking alcohol and smoking crack.  (*Id.*).  According to Gonzalez-Cruz, his relapses were triggered by feelings of loneliness, difficulties with his girlfriend, and anxiety relating to his SSI proceedings.  (*Id.*).  He attempted to keep himself busy by working, spending time with his girlfriend, and attending church.  (*Id.*).  He indicated that he performed jobs, including lawn work and painting, when he could find them.  (*Id.*).  Due to his multiple relapses, he was transferred to a higher level

of care and began the Latino Rehab program in November 2013.  (*Id.*).  After transferring to this higher level of care with increased monitoring, Gonzalez-Cruz was able to maintain his sobriety. (*Id.*).

Treatment notes from 2014 indicate that Gonzalez-Cruz continued to maintain his sobriety and was permitted to take home his methadone doses so that he did not need to go to the clinic daily.  (*Id.*).  Gonzalez-Cruz reported that he kept himself busy working on house projects for a friend and volunteering at his church.  (*Id.*).  He indicated that he worked on small jobs when he could find them in order to feel productive and to earn money for personal items and bills.  (*Id.*).  He reported spending most of his time working at odd jobs or spending time cleaning and cooking at his apartment.  (*Id.*).  According to Gonzalez-Cruz, he spent every weekend working on "side jobs" to stay busy.  (*Id.*).  He also assisted his girlfriend with household chores and daily activities after she was hospitalized.  (*Id.*).

In June 2014, Gonzalez-Cruz's therapist, Felix, suggested that he consider enrolling in the Personalized Recovery Oriented Services Program ("PROS"), but Gonzalez-Cruz expressed that he was not interested.  (*Id.*).  Felix also discussed "completing" him from the rehab program.  (*Id.*).  Gonzalez-Cruz was pleased with his progress and indicated that he had learned a lot and had been able to maintain his sobriety by engaging in the program. (*Id.*).

### B.     Medical Opinion Evidence

### 1.      Kavitha Finnity, PhD

On April 26, 2010, Kavitha Finnity ("Finnity"), PhD, conducted a consultative examination of Gonzalez-Cruz and completed a psychological and intellectual assessment for determination of employability form for the Monroe County Department of Social Services

("DSS"). (Tr. 388-93). Gonzalez-Cruz was accompanied by a friend, who served as a translator. (*Id.*). He reported symptoms of depression and psychosis, including depressed mood, crying, difficulty sleeping, hopelessness, decreased energy, isolation, varied appetite, difficulty with concentration and focus, occasional panic attacks, visual and auditory hallucinations, and feelings of paranoia. (*Id.*). Gonzalez-Cruz reported previous drug use and current daily alcohol consumption. (*Id.*).

Upon examination, Finnity noted that Gonzalez-Cruz appeared normal, and demonstrated normal thought process, orientation, attention and concentration, and memory, but exhibited a dysthymic mood and depressed affect. (*Id.*). According to Finnity, Gonzalez-Cruz's insight and judgment were fair, and he demonstrated deficient cognitive functioning. (*Id.*). Finnity administered the test of nonverbal intelligence due to Gonzalez-Cruz's inability to speak English, and he scored a 61, which Finnity noted was in the mildly mentally retarded range of intelligence. (*Id.*). Finnity diagnosed Gonzalez-Cruz with major depressive disorder, moderate, panic disorder without agoraphobia, schizophrenia, polysubstance abuse in sustained remission, alcohol abuse, and mild mental retardation, and assessed a GAF of 45. (*Id.*).

Finnity opined that Gonzalez-Cruz was able to follow, understand, and remember simple directions and tasks, maintain basic standards of hygiene and grooming, use public transportation, and perform low stress and simple tasks. (*Id.*). Finnity further opined that Gonzalez-Cruz was moderately limited[3] in his ability to perform complex tasks independently and regularly attend to a routine and maintain a schedule. (*Id.*). Finnity also opined that Gonzalez-Cruz was very limited[4] in his ability to maintain attention and concentration for rote

---

[3] "Moderately limited" was defined as "unable to function 50% of the time." (*Id.*).

[4] "Very limited" was defined as "unable to function 75% or more of the time." (*Id.*).

tasks. (*Id.*). Finnity opined that Gonzalez-Cruz was permanently disabled due to his ongoing mental health symptoms and his limited cognitive functioning. (*Id.*).

### 2. **Margery Baittle, PhD**

On September 23, 2010, state examiner Margery Baittle ("Baittle"), PhD, conducted a consultative psychiatric evaluation of Gonzalez-Cruz. (Tr. 448-51). Gonzalez-Cruz's sister drove him to the evaluation and served as an interpreter. (*Id.*). Gonzalez-Cruz reported that he had attended a few years of elementary school in Puerto Rico and had received special education services for learning problems. (*Id.*). Gonzalez-Cruz indicated that he had never worked, and lived alone, although his sisters checked on him frequently. (*Id.*).

Gonzalez-Cruz's sister reported that he had received psychiatric inpatient care at a hospital in Puerto Rico for "many, many years," but his paperwork was lost in a 1996 hospital fire. (*Id.*). Gonzalez-Cruz participated in a chemical dependency group and mental health treatment at Strong. (*Id.*). Gonzalez-Cruz reported experiencing trouble sleeping, difficulty concentrating, crying spells, irritability, psychomotor agitation, fatigue, and feelings of hopelessness, although he noted that his medicine provided some relief of the symptoms. (*Id.*). He reported to his sister that he frequently saw dead people and sometimes heard voices calling him. (*Id.*). Baittle indicated that Gonzalez-Cruz appeared to have cognitive deficiencies, including an inability to read, write, and recall. (*Id.*).

Gonzalez-Cruz reported a history of cocaine and heroin use, but that he was currently participating in treatment. (*Id.*). According to his sister, Gonzalez-Cruz had been wrongly accused of abusing his nephew and had spent six years in prison. (*Id.*). Gonzalez-Cruz reported that he was able to manage most activities of daily living, although his sister assisted

him.  (*Id.*).  He was not able to drive or manage money and typically socialized only with his family.  (*Id.*).  He reportedly spent his days going to appointments, walking, and watching television. (*Id.*).

Upon examination, Baittle noted that Gonzalez-Cruz appeared neatly dressed and well-groomed.  (*Id.*).  Baittle noted that Gonzalez-Cruz appeared to speak rapidly and to the point.  (*Id.*).  According to Baittle, Gonzalez-Cruz had coherent and goal-directed thought processes, appropriate affect, somewhat dysthymic mood, apparent clear sensorium, "okay" orientation, poor insight, fair judgment, and "probably borderline to deficient" cognitive functioning.  (*Id.*).  Baittle noted that Gonzalez-Cruz's attention and concentration were intact.  (*Id.*).  Gonzalez-Cruz showed difficulty with memory skills, likely due to his limited intellectual functioning.  (*Id.*).  According to Baittle, Gonzalez-Cruz could recall two out of three objects, and could complete no digits forward and backward.  (*Id.*).

According to Baittle, Gonzalez-Cruz was generally inhibited in most areas due to his low intelligence.  (*Id.*).  She opined that he did not "quite make appropriate decisions or relate well with others" and had some difficulty dealing with stress.  (*Id.*).  Baittle opined that the examination results were consistent with cognitive and psychiatric problems and that his cognitive problems might significantly interfere with his ability to function on a daily basis.  (*Id.*).  Baittle diagnosed Gonzalez-Cruz with depressive disorder, not otherwise specified, cocaine and heroin dependence abuse in remission, and "possibly mild mental retardation."  (*Id.*).  She also indicated that Gonzalez-Cruz was probably unable to manage his funds.  (*Id.*).

### 3.     **Z. Mata, Psychiatry**

On September 29, 2010, agency medical consultant Dr. Z. Mata ("Mata") completed a Psychiatric Review Technique.  (Tr. 434-46).  Mata concluded that Gonzalez-Cruz

suffered from mild mental retardation, but that his mental impairments did not meet or equal

listed impairments 12.05 or 12.09.  (*Id.*).  According to Mata, Gonzalez-Cruz suffered from

moderate limitations in social functioning and in maintaining concentration, persistence or pace,

and mild limitations in his activities of daily living.  (*Id.*).  Mata completed a mental Residual

Functional Capacity ("RFC") assessment.  (Tr. 423-26).  Mata opined that Gonzalez-Cruz

suffered from moderate limitations in his ability to remember locations and work-like

procedures, understand, remember and carry out detailed instructions, perform activities within a

schedule, maintain regular attendance, and be punctual within customary tolerances, sustain an

ordinary routine without special supervision, complete a normal workday and workweek without

interruptions from psychologically-based symptoms, and to perform at a consistent pace without

an unreasonable number and length of rest periods, accept instructions and respond appropriately

to criticism from supervisors, get along with coworkers or peers without distracting them or

exhibiting behavioral extremes, respond appropriately to changes in the work setting, be aware

of normal hazards and take appropriate precautions, travel in unfamiliar places or use public

transportation, and set realistic goals or make plans independently of others.  (*Id.*).  Mata further

opined that Gonzalez-Cruz's abilities were not significantly limited in the following areas:

understanding, remembering and carrying out very short and simple instructions, maintaining

attention and concentration for extended periods, working in coordination with or proximity to

others without being distracted, making simple work-related decisions, interacting appropriately

with the general public, asking simple questions and requesting assistance, and maintaining

socially appropriate behavior and adhering to basic standards of neatness and cleanliness.  (*Id.*).

According to Mata, Gonzalez-Cruz retained the ability to perform simple unskilled work.  (*Id.*).

## 4. <u>Ruiz</u>

On June 17, 2011, Gonzalez-Cruz's counselor, Ruiz, completed a Monroe County DHS Psychological Assessment for Determination of Employability form. (Tr. 739-42). Ruiz indicated that Gonzalez-Cruz had been a patient since 2006 and that she had met with him thirteen times during the previous year. (*Id.*). She indicated that he suffered from severe anxiety and an inability to sleep. (*Id.*). According to Ruiz, Gonzalez-Cruz had been diagnosed with depressive disorder and a learning disorder, and she assessed a GAF of 60. (*Id.*). She opined that Gonzalez-Cruz was moderately[5] limited in his ability to follow, understand and remember simple instructions and directions, regularly attend to a routine and maintain a schedule, and perform low stress and simple tasks. (*Id.*). She also concluded that Gonzalez-Cruz was very limited[6] in his ability to perform simple and complex tasks independently and to maintain attention and concentration for role tasks. (*Id.*). She indicated that Gonzalez-Cruz was able to use public transportation, but was unable to participate in any activities other than treatment or rehabilitation for the next seven months. (*Id.*).

Sometime later, apparently in response to a June 2014 request from Gonzalez-Cruz's representative, Ruiz completed a mental impairment questionnaire. (Tr. 955-57, 958). She indicated that she treated him biweekly or as needed for thirty-minute individual sessions. (*Id.*). According to Ruiz, Gonzalez-Cruz suffered from depressive disorder, not otherwise specified, and a learning disorder, and she assessed a GAF of 60. (*Id.*). She indicated that his prognosis was guarded and that he continued to display anxiety and sadness. (*Id.*).

---

[5] Moderately limited was defined to mean inability to function 10-25% of the time. (*Id.*).

[6] Very limited was defined to mean inability to function 25% or more of the time. (*Id.*).

According to Ruiz, Gonzalez-Cruz suffered from severe[7] limitations in his ability to understand, remember, or carry out multi-step instructions, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, sustain an ordinary routine without special supervision, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in a routine work setting. (*Id.*). Additionally, she opined that Gonzalez-Cruz suffered from moderately severe[8] limitations in his ability to remember locations and work-like procedures, understand, remember or carry out one-step instructions, make simple work-related decisions, maintain concentration and attention for extended periods, work in coordination with or proximity to others without being unduly distracted by them, complete a normal workday/week without interruptions from psychologically-based symptoms, perform at a consistent pace, be aware of normal hazards and take appropriate precautions, get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior, and meet basic standards of neatness and cleanliness. (*Id.*).

Ruiz opined that Gonzalez-Cruz had a low IQ or limited intellectual functioning based upon his inability to read or write. (*Id.*). According to Ruiz, Gonzalez-Cruz suffered from anxiety and was unable to maintain focus and attention or sit still for extended periods. (*Id.*). Ruiz opined that he would likely be absent from work more than three days a month due to his need to maintain attendance at his treatment appointments. (*Id.*).

---

[7] Severe was defined to mean totally precluded. (*Id.*).

[8] Moderately severe was defined to mean ability to perform at 60-80% of normal expected productivity. (*Id.*).

5.      **Dennis M. Noia, PhD**

On November 14, 2011, state examiner Dennis M. Noia ("Noia"), PhD, conducted a consultative psychiatric evaluation of Gonzalez-Cruz.  (Tr. 751-54). Gonzalez-Cruz's friend drove him to the evaluation and served as an interpreter.  (*Id.*). Gonzalez-Cruz indicated that he had previously worked as a cleaner for eleven months in 2000, but was fired.  (*Id.*).  He also had previously performed labor work.  (*Id.*).

Gonzalez-Cruz reported that he had been hospitalized in 1986 for a suicide attempt and had been receiving ongoing biweekly outpatient mental health treatment at Strong since 2006.  (*Id.*).  He reported difficulty falling asleep and decreased appetite, but no significant depressive, manic or anxiety-related symptoms or symptoms of cognitive dysfunction.  (*Id.*). Gonzalez-Cruz indicated that he suffered from auditory and visual hallucinations and that treatment improved his symptoms.  (*Id.*).

Gonzalez-Cruz reported a history of cocaine, heroin and marijuana use and that he was currently participating in methadone treatment.  (*Id.*).  He indicated that he drank alcohol daily, but was enrolled in an alcohol abuse program.  (*Id.*).  Gonzalez-Cruz reported that he had been incarcerated for six years for rape.  (*Id.*).  He indicated that he was able to care for his personal hygiene, prepare meals and perform household chores including cleaning and laundry, but was unable to shop, manage money, or drive.  (*Id.*).  He was able to use public transportation and his friends assisted him with chores.  (*Id.*).  Gonzalez-Cruz reported difficulty getting along with family and friends.  (*Id.*).

Upon examination, Noia noted that Gonzalez-Cruz was cooperative, but that his manner of relating, social skills, and overall presentation were marginal.  (*Id.*).  Noia noted that Gonzalez-Cruz was appropriately dressed and demonstrated normal motor behavior, poor eye

contact, apparent intelligibility, fluent and clear speech, coherent and goal-directed thought processes, neutral mood, clear sensorium, full orientation, poor insight, poor judgment, and deficient intellectual functioning with a limited fund of general information. (*Id.*). According to Noia, Gonzalez-Cruz's attention and concentration were intact, but he was unable to perform counting, simple calculations or serial threes due to his poor arithmetic skills. (*Id.*). Gonzalez-Cruz's memory skills were severely impaired. (*Id.*). According to Noia, Gonzalez-Cruz could recall three out of three objects immediately, but none after a delay, and could complete two digits forward and none backward. (*Id.*).

Noia opined that Gonzalez-Cruz appeared capable of understanding and following simple instructions and directions, performing simple tasks independently and with supervision, maintaining attention and concentration for tasks, regularly attending to a routine and maintaining a schedule, learning simple new tasks, and relating and interacting marginally well with others. (*Id.*). Noia opined that Gonzalez-Cruz appeared to have difficulty making appropriate simple decisions and dealing with stress. (*Id.*). He assessed that Gonzalez-Cruz suffered from psychotic disorder, not otherwise specified, alcohol abuse, and mild mental retardation. (*Id.*). He opined that Gonzalez-Cruz's prognosis was "poor, but it is hoped that with continued intervention and support, he will find symptom relief and maximize his abilities." (*Id.*).

6. **T. Harding, Psychology**

On November 22, 2011, agency medical consultant Dr. T. Harding ("Harding") completed a Psychiatric Review Technique. (Tr. 770-83). Harding concluded that Gonzalez-Cruz's mental impairments did not meet or equal listed impairments 12.03 or 12.09. (*Id.*). According to Harding, Gonzalez-Cruz suffered from moderate limitations in activities of

daily living, social functioning, and in maintaining concentration, persistence or pace. (*Id.*).

Harding completed a mental RFC assessment. (Tr. 761-64). Harding opined that Gonzalez-Cruz suffered from moderate limitations in his ability to understand, remember and carry out detailed instructions, complete a normal workday and workweek without interruptions from psychologically-based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, and accept instructions and respond appropriately to criticism from supervisors. Harding further opined that Gonzalez-Cruz's abilities were not significantly limited in the following areas: remembering locations and work-like procedures, understanding, remembering, and carrying out very short and simple instructions, maintaining attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being distracted by them, making simple work-related decisions, asking simple questions or requesting assistance, getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness, responding appropriately to changes in the work setting, being aware of normal hazards and taking appropriate precautions, traveling in unfamiliar places or using public transportation, and setting realistic goals or making plans independently of others. (*Id.*). According to Harding, Gonzalez-Cruz retained the ability to understand and carry out simple instructions, use appropriate judgment to make simple work-related decisions, respond appropriately to supervision and coworkers, deal with changes in a routine work setting, and effectively, appropriately and independently perform activities of daily living on a sustained basis. (*Id.*).

### 7.    Adam Brownfeld, PhD

The record suggests that the SSA attempted to obtain a Spanish-speaking examiner or a Spanish IQ test, but that neither were available.  (Tr. 369).  Accordingly, the SSA requested a non-verbal IQ evaluation of Gonzalez-Cruz with a Spanish interpreter present.  (*Id.*).  On November 4, 2013, state examiner Adam Brownfeld ("Brownfeld"), PhD, conducted the intelligence evaluation of Gonzalez-Cruz.  (Tr. 785-89).  According to Brownfeld, the interpreter reported that Gonzalez-Cruz was tangential and circumstantial throughout the evaluation and required redirection to the questions.  (*Id.*).

Gonzalez-Cruz reported that he had no formal education, lived alone, and had previously been employed in 2000 for six months in a temporary maintenance position.  (*Id.*).  Gonzalez-Cruz reported that he suffered from depressive symptoms, including dysphoric moods, crying spells, loss of usual interests, diminished sense of pleasure, and social withdrawal.  (*Id.*).  He also endorsed the anxiety symptom of excessive worrying, and experiencing auditory and visual hallucinations during the previous month.  (*Id.*).  Gonzalez-Cruz reported that he suffered from memory deficits, concentration difficulties, and difficulty learning new material.  (*Id.*).  According to Gonzalez-Cruz, he was hospitalized for a suicide attempt when he was twelve, and again on September 4, 2013, for suicidal ideation.  (*Id.*).  He also reported behavioral and learning problems in early childhood.  (*Id.*).

Gonzalez-Cruz reported that he was able to care for his personal hygiene and to prepare simple meals, clean, and wash laundry.  (*Id.*).  According to Gonzalez-Cruz, a friend accompanied him shopping and managed his finances due to his limited intellectual functioning.  (*Id.*).  He reported that he was able to take public transportation with his friend, had a good social life, and enjoyed working with his hands.  (*Id.*).

Brownfeld administered the Test of Nonverbal Intelligence ("TONI-4"), but Gonzalez-Cruz failed to complete correctly any of the six practice trials. (*Id.*). Brownfeld re-administered the practice trials, but Gonzalez-Cruz continued to answer incorrectly. (*Id.*). Brownfeld opined that Gonzalez-Cruz was not putting forth his best effort, and asked him to do so. (*Id.*). At that point, Gonzalez-Cruz reported that he did not want to continue and refused to participate in the intellectual evaluation. (*Id.*). Brownfeld opined that Gonzalez-Cruz likely had difficulty with intelligence testing due to his lack of schooling, but it was "clear that the claimant was not putting forth his best effort on the practice items." (*Id.*).

Brownfeld opined that Gonzalez-Cruz was mildly limited in following and understanding simple directions and instructions, and performing simple tasks independently, but would not require supervision. (*Id.*). According to Brownfeld, Gonzalez-Cruz was moderately limited in maintaining attention and concentration and a regular schedule, learning new tasks, and relating adequately with others. (*Id.*). He further opined that Gonzalez-Cruz was markedly limited in appropriately dealing with stress given his recent psychiatric hospitalization and moderately to markedly limited in making appropriate decisions given his behavior during the evaluation and his legal history. (*Id.*). With respect to performing complex tasks, Brownfeld believed that Gonzalez-Cruz was markedly limited and would require supervision. (*Id.*). Brownfeld attributed Gonzalez-Cruz's difficulties to his cognitive and psychiatric deficits. (*Id.*). He diagnosed Gonzalez-Cruz with depressive disorder, not otherwise specified, psychotic disorder, not otherwise specified, and cognitive disorder, not otherwise specified. (*Id.*).

### III.    Non-Medical Evidence

Gonzalez-Cruz was born in 1967 and was forty-six years old at the time of the administrative hearing.  (Tr. 60, 343).  In connection with his request for benefits, Gonzalez-Cruz reported that he relied heavily upon a friend to assist him with household chores.  (Tr. 350).  According to Gonzalez-Cruz, his friend helped him prepare meals, clean, grocery shop, and wash laundry.  (*Id.*).  Gonzalez-Cruz reported that he often got lost traveling to appointments.  (*Id.*).

During the administrative hearing, Gonzalez-Cruz testified that he had never attended school and was unable to read or write.  (Tr. 60).  He reported prior work history in Puerto Rico, including construction, sweeping, and driving a bus, despite not having a license.  (Tr. 60-61).  He indicated that he was unable to work due to heart problems, high blood pressure, and mental health issues.  (Tr. 61).  Gonzalez-Cruz testified that he received mental health treatment every two weeks and participated in a rehabilitation program.  (Tr. 61-62).

Gonzalez-Cruz testified that he lived alone in a studio apartment and was able to prepare his own meals and clean his apartment, although sometimes his sister helped him with household chores.  (Tr. 62-63).  According to Gonzalez-Cruz, he relied on a friend or his sister for transportation, laundry, and grocery shopping.  (Tr. 63-65).  Gonzalez-Cruz testified that he was unable to perform simple addition and subtraction, although he was able to count money.  (Tr. 63-64).

Gonzalez-Cruz testified that he had difficulty concentrating and following directions and did not socialize with his family, other than his sister.  (*Id.*).  He also took medication for depression, which provided some benefit.  (Tr. 67).  He testified that he attended church and had a girlfriend.  (Tr. 66).  Gonzalez-Cruz testified that he had not consumed cocaine

or marijuana in approximately twenty years. (Tr. 65). According to Gonzalez-Cruz, he had not consumed alcohol since October 2013. (Tr. 66).

Gonzalez-Cruz initially testified that he had not performed any paid work during the previous five years. (Tr. 65). Upon further questioning, he indicated that he worked under the table cleaning cars, sweeping, and painting, in order to earn money for personal necessities, such as toilet paper, toothpaste and soap. (Tr. 67-69). According to Gonzalez-Cruz, he performed such work infrequently and earned only approximately forty dollars per month. (*Id.*).

George Starosta ("Starosta"), a vocational expert, also testified during the hearing. (Tr. 69-73). The ALJ asked Starosta to characterize Gonzalez-Cruz's previous employment. (Tr. 70). According to Starosta, Gonzalez-Cruz previously had been employed as a car cleaner, a sweeper, and a painter. (Tr. 70-71).

The ALJ asked Starosta whether jobs would exist for an individual who was the same age as Gonzalez-Cruz, with the same education and vocational profile, and who was able to perform the full range of work at all exertional levels, but who was unable to communicate effectively in English, was functionally illiterate, and was limited to jobs involving simple, routine and repetitive tasks in a work environment free of fast-paced production requirements, with only simple work-related decisions, few, if any, changes in the workplace, and no more than occasional interpersonal interaction with members of the public, coworkers and supervisors. (Tr. 71). Starosta testified that such an individual would be able to perform the jobs of dishwasher, night cleaner, and laundry hand folder. (Tr. 72). Starosta testified that an individual could be off-task up to twenty percent of the time and still maintain employment. (*Id.*). He also testified that his testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (*Id.*).

# **DISCUSSION**

## I.    **Standard of Review**

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams ex rel Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent

they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). When assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

> (1)    whether the claimant is currently engaged in substantial gainful activity;
>
> (2)    if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";
>
> (3)    if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;
>
> (4)    if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and
>
> (5)    if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467. "The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'"  *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

A.    **The ALJ's Decision**

In his decision, the ALJ followed the required five-step analysis for evaluating disability claims.  (Tr. 18-30).  Under step one of the process, the ALJ found that although Gonzalez-Cruz had engaged in work activity, he had not engaged in substantial gainful activity since the application date.  (Tr. 20).  At step two, the ALJ concluded that Gonzalez-Cruz had the severe impairments of schizophrenic disorder, depressive disorder, learning disorder, alcohol abuse, and substance abuse in remission.  (*Id.*).  The ALJ concluded that Gonzalez-Cruz's hypertension, allergic rhinitis, and hepatitis C were not severe.  (Tr. 21).  At step three, the ALJ determined that Gonzalez-Cruz did not have an impairment (or combination of impairments) that met or medically equaled one of the listed impairments.  (Tr. 21-24).  With respect to Gonzalez-Cruz's mental limitations, the ALJ found that Gonzalez-Cruz suffered from moderate difficulties in his activities of daily living, social functioning, and in maintaining concentration, persistence or pace.  (*Id.*).  With respect to Listing 12.05, the ALJ determined that Gonzalez-Cruz failed to satisfy the requirements of paragraphs A and B because he lived independently and did not have a valid IQ of 59 or less.  (*Id.*).  The ALJ also determined that Gonzalez-Cruz failed to satisfy the requirements of paragraph C because he did not have a valid IQ score of 60 through 70 and did not manifest deficits in adaptive functioning.  (*Id.*).

The ALJ concluded that Gonzalez-Cruz had the RFC to perform the full range of work at all exertional levels, but was unable to communicate effectively in English, was functionally illiterate, and was limited to jobs involving simple, routine and repetitive tasks in a

work environment free of fast-paced production requirements, with only simple work-related decisions, few, if any, changes in the workplace, and no more than occasional interpersonal interaction with members of the public, coworkers and supervisors. (Tr. 24-29). At steps four and five, the ALJ determined that Gonzalez-Cruz had no past relevant work, but that other jobs existed in the national and regional economy that Gonzalez-Cruz could perform, including the positions of dishwasher, night cleaner, and laundry hand folder. (Tr. 29-30). Accordingly, the ALJ found that Gonzalez-Cruz was not disabled. (*Id.*).

**B. Gonzalez-Cruz's Contentions**

Gonzalez-Cruz contends that the ALJ's determination that he is not disabled is not supported by substantial evidence and is the product of legal error. (Docket ## 12-1, 15). First, Gonzalez-Cruz contends that the ALJ erred because he failed to properly consider whether Gonzalez-Cruz satisfied the requirements of Listing 12.05C.[9] (Docket ## 12-1 at 20-25; 15 at 2-6). According to Gonzalez-Cruz, the ALJ failed to properly develop the record by ordering an additional intelligence evaluation, and substantial evidence did not support the ALJ's conclusion that he did not suffer from deficits in adaptive functioning. (*Id.*). Gonzalez-Cruz also maintains that the ALJ's mental RFC assessment was flawed because he failed to properly weigh Ruiz's opinion concerning Gonzalez-Cruz's limitations. (Docket ## 12-1 at 26-29; 15 at 6-7).

---

[9] In a footnote, Gonzalez-Cruz also argues that the ALJ erred by failing to consider whether Gonzalez-Cruz suffered from a severe cognitive impairment, intellectual disability or mental retardation at step two, instead considering only whether Gonzalez-Cruz's learning disability was severe. (*Id.* at 20 at n.34). Any such error by the ALJ in this case was harmless; the decision demonstrates that the ALJ continued through the sequential evaluation process and explicitly considered limitations relating to Gonzalez-Cruz's cognitive functioning at each step of the evaluation. *See Brown v. Comm'r of Soc. Security*, 2017 WL 2312914, *7 (N.D.N.Y. 2017) ("because the ALJ considered the evidence related to [p]laintiff's traumatic brain injury and accounted for the range of mental and cognitive impairments reasonably supported by the evidence in the record, any error to classify [p]laintiff's traumatic brain injury as severe at Step Two was harmless and does not merit remand"); *Brito v. Colvin*, 2015 WL 1470555, *21 n.16 (W.D.N.Y. 2015) ("[t]o the extent that [plaintiff] argues that the ALJ erred at step two by determining that his mental impairments were not severe, I conclude that any purported error was harmless because the ALJ considered [plaintiff's] mental impairments during the remainder of the sequential analysis") (citing *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013)).

Gonzalez-Cruz also challenges the ALJ's step five determination because the vocational expert's testimony was based upon a flawed RFC. (Docket # 12-1 at 29-31). Additionally, in a footnote in his reply papers, Gonzalez-Cruz argues for the first time that the ALJ erred in relying upon the vocational expert's testimony because it was inconsistent with the DOT. (Docket # 15 at 7 n.5).

## II.    Analysis

### A.    Step Three Determination

If a claimant's impairments meet or medically equal the criteria set forth in Appendix 1 to Subpart P of Part 404 of the regulations, the claimant is automatically entitled to benefits. *See DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir. 1998) ("[t]he Social Security regulations list certain impairments, any of which is sufficient, at step three, to create an irrebuttable presumption of disability") (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The claimant carries the burden of demonstrating that his impairments meet or are equal in severity to one of the listings, and the claimant is required to show that his impairment meets each of the medical criteria set forth in the listing. *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (impairment does not qualify if it "manifests only some of those criteria, no matter how severely").

Listing 12.05C, entitled "Intellectual Disability," provides in relevant part:

*Intellectual disability*: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

C.    A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental

34

> impairment imposing an additional and significant
> work-related limitation of function.

20 C.F.R. Part 404, Subpt. P, App. 1, § 12.05C.[10]  To establish that he meets Listing 12.05C (the

"Listing"), Gonzalez-Cruz must demonstrate: "(1) significantly subaverage general intellectual

functioning with deficits in adaptive functioning initially manifested before age 22; (2) a valid IQ

score of 60 through 70; and (3) another severe physical or mental impairment." *Miller v. Astrue*,

2009 WL 2568571, *4 (N.D.N.Y. 2009).

      Gonzalez-Cruz contends that the ALJ erred in concluding that he did not have an

impairment or combination of impairments that met or medically equaled the requirements of

Listing 12.05C.  (Docket ## 12-1 at 20-25; 15 at 2-6).  According to Gonzalez-Cruz, the record

demonstrates that he satisfies each of the requirements of the listing.  (*Id.*).  With respect to

deficits in adaptive functioning, Gonzalez-Cruz maintains that he did not attend school, is

illiterate, cannot perform simple math, and requires assistance to complete forms – all of which

demonstrate that he is not able to navigate everyday challenges.  (Docket # 12-1 at 24).

Adaptive functioning refers to an individual's "[a]bility to cope with the challenges of ordinary

everyday life." *Talavera v. Astrue*, 697 F.3d 145, 153 (2d Cir. 2012) (quoting *Novy v. Astrue*,

497 F.3d 708, 710 (7th Cir. 2007)).  Courts consider a variety of abilities in evaluating whether

an individual demonstrates adaptive functioning, including "effectiveness in areas of social

skills, communication, and daily living skills." *Spaich v. Berryhill*, 2017 WL 6014451, *3

(W.D.N.Y. 2017).  The ability to live alone, care for others, prepare meals, pay bills,

communicate, and perform other activities of daily living generally demonstrates adaptive

---

[10]  Effective January 17, 2017, the Social Security Administration amended the criteria in the listings used to evaluate claims of intellectual disability and eliminated Listing 12.05C.  *See* Soc. Sec. Admin., *Revised Criteria for Evaluating Mental Disorders*, 81 Fed. Reg. 66138-01 (Sept. 26, 2016).  Accordingly, the Court refers to the version of 12.05C that was in effect at the time the ALJ issued his decision.  *See id.* at *66139 n.1 ("[w]e expect that federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions").

functioning, *Manni v. Colvin*, 2017 WL 1066667, *3 (N.D.N.Y. 2017), while participation in special education classes, inability to graduate, or difficulties in reading, writing or math suggest deficits in adaptive functioning, *Trimm v. Comm'r of Soc. Sec.*, 2016 WL 7414531, *6 (N.D.N.Y.), *report and recommendation adopted*, 2016 WL 7409060 (N.D.N.Y. 2016). *See Manni v. Colvin*, 2017 WL 1066667 at *3 ("[t]he regulations do not require that a claimant be completely helpless, rather, courts consider multiple factors, including, living on one's own, independently caring for children, cooking, paying bills, communication abilities, and daily living skills") (internal quotations omitted); *Trimm v. Comm'r of Soc. Sec.*, 2016 WL 7414531 at *6 ("[c]ourts have found attendance in special education classes, failure to complete school before graduation, or difficulties in reading, writing, or math, circumstantial evidence sufficient to infer deficits in adaptive functioning[,] . . . [but] have also found that a plaintiff did not suffer from deficits in adaptive functioning where plaintiff could dress, bathe, manage money, communicate effectively, do simple math and take care of personal needs"); *Marmer v. Colvin*, 2014 WL 1365471, *4 (E.D.N.Y. 2014) ("[c]ourts have enumerated examples of daily activities that evidence adequate adaptive functioning: successful education in regular classes as opposed to special education courses, living on one's own, taking care of children without help, paying bills and managing one's own finances, and engaging in productive social relationships").

Having reviewed the record, I find that substantial evidence supports the ALJ's conclusion that Gonzalez-Cruz has not demonstrated deficits in adaptive functioning as required to meet Listing 12.05C. Although acknowledging that Gonzalez-Cruz had little to no education, was unable to read or write, and suffered from memory deficits, the ALJ noted that Gonzalez-Cruz nonetheless was able to engage in all aspects of personal care, prepare meals, perform general household chores, including laundry, and use public transportation. (Tr. 24, 26).

According to the ALJ, Gonzalez-Cruz testified that he lived alone, was generally able to engage in daily activities, and had performed several jobs, including car washing, lawn work, and painting. (*Id.*). The ALJ also reviewed treatment records that demonstrated normal thought processes, intact memory, and fair concentration. (Tr. 25). Indeed, as the ALJ discussed, one of Gonzalez-Cruz's treating sources opined that he would be able to engage in employment and that he was "very resourceful at baseline." (*Id.*).

The record contains significant evidence demonstrating Gonzalez-Cruz's ability to engage successfully in everyday activities. Gonzalez-Cruz was able to maintain social relationships with his sister, girlfriends, and friends, including those he made through work. (Tr. 450, 462, 514, 520, 530, 563, 583, 606, 663, 883, 903). Gonzalez-Cruz repeatedly reported an ability to engage in everyday activities, including personal grooming, preparing simple meals, cleaning, and doing laundry. (Tr. 453, 753, 787, 899). He attended church weekly and volunteered. (Tr. 903-04, 923). The record also suggests that Gonzalez-Cruz cared for his girlfriend after she had surgery. (Tr. 953-54). There are multiple references in the record to Gonzalez-Cruz's ability to engage in work-related activities, including washing cars, painting, doing lawn work, repairing roofs and making household repairs, and paid employment in a maintenance position for six months. (Tr. 60, 69, 551, 598, 604, 641, 686, 785, 909, 939). Further, several medical professionals offered opinions consistent with the ALJ's conclusion that Gonzalez-Cruz was able to engage in some work-related activities. (Tr. 399, 425, 565, 754, 763). Accordingly, the ALJ's conclusion that Gonzalez-Cruz has not demonstrated that he suffers from deficits in adaptive functioning is supported by substantial evidence in the record. *See Spaich v. Berryhill*, 2017 WL 6014451 at *3-4 (substantial evidence supported ALJ's conclusion that plaintiff did not suffer from deficits in adaptive functioning where plaintiff

volunteered, had graduated from high school, cared for pets, cleaned her room, performed household chores, socialized with friends, and where medical opinions suggested she could engage in simple work-related activities); *Gross v. Comm'r of Soc. Sec.*, 2017 WL 2574015, *5 (N.D.N.Y. 2017) (substantial evidence supported ALJ's conclusion regarding the absence of deficits in adaptive functioning despite special education, inability to drive and difficulty managing money; plaintiff could "tend to his personal care, cook, clean, shop, and do laundry," lived in his own apartment, had completed some college courses, and had worked at a restaurant); *Trimm*, 2016 WL 7414531 at *6 (although plaintiff attended special education classes, he did not demonstrate deficits of adaptive functioning where he was able to care for his personal needs, cook, clean, do laundry, go shopping, drive, travel independently, engage in work activity, fish, camp, and play video games).

   In reaching this conclusion, I acknowledge that some evidence in the record supports Gonzalez-Cruz's contention that he suffers from adaptive functioning deficits. Nevertheless, "under the substantial evidence standard of review, it is not enough for [p]laintiff to merely disagree with the ALJ's weighing of the evidence or to argue that evidence in the record could support [his] position." *Warren v. Comm'r of Soc. Sec.*, 2016 WL 7223338, *6 (N.D.N.Y.), *report and recommendation adopted*, 2016 WL 7238947 (N.D.N.Y. 2016). Rather, he must "show that no reasonable factfinder could have reached the ALJ's conclusions based on the evidence in the record."[11] *Id.* Given the record evidence discussed above, and the fact that

---

[11] In arguing for remand, Gonzalez-Cruz's submission appears to suggest the opposite – that reasonable minds could differ regarding the conflicting evidence. (*See* Docket # 12-1 at 25 ("this is not a situation '[w]here application of the correct legal standard could lead to only one conclusion'") (quoting *Carpenter v. Comm'r of Soc. Sec.*, 2014 WL 859160, *4 (N.D.N.Y. 2014)). In *Carpenter*, the ALJ concluded that the claimant did not meet the IQ requirements of Listing 12.05 and never analyzed whether the claimant had demonstrated deficits in adaptive functioning. *See Carpenter v. Comm'r of Soc. Sec.*, 2014 WL 859160 at *4 ("[the ALJ] failed to specifically address deficits in adaptive functioning"). In this case, by contrast, the ALJ specifically addressed deficits in adaptive functioning and concluded that the record did not support the conclusion that Gonzalez-Cruz suffered from such deficits. (Tr. 23-24).

the ALJ's decision reflects that he considered that evidence, as well as evidence contrary to his conclusion, there is no basis for this Court to overturn the ALJ's resolution of the conflicting evidence. *See Hoyt v. Colvin*, 2016 WL 3681425, *6 (S.D.N.Y.) ("evidence that [plaintiff] does not know how to drive, 'frequently gets lost when using public transportation,' is unable to shop for groceries without assistance with the budget, cannot cook, was unable to complete a cooking class and reads a 'little bit' but mostly does not understand what she is reading, is not sufficient to satisfy [plaintiff's] burden at step three of the sequential analysis, even if that evidence is substantial, because substantial evidence in the record supports the ALJ's finding that [plaintiff] has an adequate level of adaptive functioning"), *report and recommendation adopted*, 2016 WL 3676673 (S.D.N.Y. 2016); *Casey v. Comm'r of Soc. Sec.*, 2015 WL 5512602, *9 (N.D.N.Y. 2015) ("[i]t is the province of the [ALJ] to consider and resolve conflicts in the evidence as long as the decision rests upon adequate findings supported by evidence having rational probative force[;] . . . [the ALJ] properly considered the totality of the record evidence, and concluded that the evidence quoted above outweighed [plaintiff's] evidence to the contrary") (internal quotation omitted).

Gonzalez-Cruz also maintains that the ALJ erred by rejecting the IQ score assessed by Finnity, particularly without further developing the record by obtaining a valid IQ score. (Docket ## 12-1 at 20-23; 15 at 3-6). Having concluded that substantial evidence supports the ALJ's conclusion that Gonzalez-Cruz does not suffer from deficits in adaptive functioning, I need not reach this issue because an error in evaluating the IQ score, if any, would be harmless. *See Trimm*, 2016 WL 7414531 at *6 ("[p]laintiff also argues that the ALJ erred in assessing his IQ score; however, any error would be harmless because substantial evidence supported the ALJ's determination that [p]laintiff did not have the requisite deficits in adaptive

functioning [;] . . . [a] reviewing court need not determine whether substantial evidence supports the ALJ's determination that a plaintiff's IQ scores were invalid, because substantial evidence supported the ALJ's determination that [p]laintiff did not demonstrate limitations in adaptive functioning") (citing *Lawler v. Astrue*, 512 F. App'x 108, 110-11 (2d Cir. 2013)); *Gross v. Comm'r of Soc. Sec.*, 2017 WL 2574015 at *4 ("this [c]ourt need not decide whether the ALJ's decision to reject these IQ scores was reasonable and supported by substantial evidence because it concludes that there is substantial evidence to support the ALJ's finding that [p]laintiff did not demonstrate the deficits in adaptive functioning required to meet Listing 12.05").

**B.**  **Mental RFC Assessment**

I turn next to Gonzalez-Cruz's challenge to the ALJ's mental RFC assessment. (Docket ## 12-1 at 26-29, 15 at 6-7). An individual's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)). In making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)). "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 370 F. App'x 231 (2d Cir. 2010).

Gonzalez-Cruz contends that the ALJ's mental RFC assessment was flawed because the ALJ improperly discounted Ruiz's opinions. (Docket ## 12-1 at 26-29, 15 at 6-7).

40

An ALJ should consider "all medical opinions received regarding the claimant." *See Spielberg v. Barnhart*, 367 F. Supp. 2d 276, 281 (E.D.N.Y. 2005) (citing 20 C.F.R. § 404.1527(d))[12]. In evaluating medical opinions, regardless of their source, the ALJ should consider the following factors:

(1)     the frequency of examination and length, nature, and extent of the treatment relationship;

(2)     the evidence in support of the physician's opinion;

(3)     the consistency of the opinion with the record as a whole;

(4)     whether the opinion is from a specialist; and

(5)     whatever other factors tend to support or contradict the opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010); *see Spielberg v. Barnhart*, 367 F. Supp. 2d at 281 ("factors are also to be considered with regard to non-treating sources, state agency consultants, and medical experts") (citing 20 C.F.R. §§ 404.1527(f)); *House v. Astrue*, 2013 WL 422058, *3 (N.D.N.Y. 2013) ("[m]edical opinions, regardless of the source are evaluated considering several factors outlined in 20 C.F.R. §§ 404.1527(c), 416.927(c)").

Licensed clinical social workers are not considered "acceptable medical sources" under the regulations. 20 C.F.R. §§ 404.1513(a), 416.913(a).[13] Instead, clinical social workers are considered "other sources" within the meaning of 20 C.F.R. §§ 404.1513(d) and 416.913(d). As such, their opinions "cannot establish the existence of a medically determinable impairment."

---

[12]  This regulation applies to claims filed before March 27, 2017. For claims filed on or after March 27, 2017, the rules in 20 C.F.R. § 404.1520c apply.

[13]  These regulations have been amended effective March 27, 2017. *See* 82 Fed. Reg. 5844-01 (Jan. 18, 2017). The Court cites the version of the regulations in effect at the time of the ALJ's decision.

*See* SSR 06-03P, 2006 WL 2329939, *2 (2006).[14]  Their opinions may be used, however, "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function."  *See id.*

Social Security Ruling 06-03P recognizes that "[m]edical sources . . . , such as . . . licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists."  *Id.* at *3.  The ruling recognizes that such opinions are "important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."  *Id.*  The ruling directs the ALJ "to use the same factors for evaluation of the opinions of acceptable medical sources to evaluate the opinions of medical sources who are not acceptable medical sources, including licensed social workers."  *Genovese v. Astrue*, 2012 WL 4960355, *14 (E.D.N.Y. 2012) (internal quotations omitted).  "An ALJ is not required to give controlling weight to a social worker's opinion; although he is not entitled to disregard it altogether, he may use his discretion to determine the appropriate weight."  *Cordero v. Astrue*, 2013 WL 3879727, *3 (S.D.N.Y. 2013); *Jones v. Astrue*, 2012 WL 1605566, *5 (N.D.N.Y.) ("the Second Circuit has held that 'the ALJ has discretion to determine the appropriate weight to accord the [other source's] opinion based on all the evidence before him") (quoting *Diaz v. Shalala*, 59 F.3d 307, 313-14 (2d Cir. 1995)), *report and recommendation adopted*, 2012 WL 1605593 (N.D.N.Y. 2012); *Allen v. Astrue*, 2008 WL 660510, *9 (N.D.N.Y. 2008) (although not an acceptable medical source, "[a]s plaintiff's longtime treating psychotherapist and the only treating source who evaluated the disabling effects of plaintiff's mental impairments, [plaintiff's

_____

[14]  Given the amendments to the regulations, this policy interpretation ruling has been rescinded effective March 27, 2017, for claims filed on or after that date.  *See* 82 Fed. Reg. 15263-01 (March 27, 2017).

therapist's] opinion was relevant to the ALJ's disability determination[;] . . . [t]hus, the ALJ should have articulated why he discredited [the therapist's] reports").

Gonzalez-Cruz maintains that the ALJ erred by discounting Ruiz's opinions because they were conveyed on a checkbox form. (Docket ## 12-1 at 28). Although the form of the opinion and the degree of explanation are factors properly considered by an ALJ in evaluating an opinion, *see Latham v. Colvin*, 2016 WL 6067848, *4 (W.D.N.Y. 2016) ("the Second Circuit has consistently held that opinions rendered on 'check-box' forms are often the ones entitled to little meaningful insight into the basis for the clinician's findings"), an ALJ should not discount a treating physician's opinion "simply because it was expressed in a 'check-the-box' format," *see Goble v. Colvin*, 2016 WL 3179901, *5 (W.D.N.Y. 2016). The ALJ's opinion makes clear, however, that the ALJ discounted Ruiz's opinions for other independent reasons. *See Prue v. Comm'r of Soc. Sec.*, 2014 WL 37669, *9 (D. Vt. 2014) (ALJ incorrectly stated opinion was entitled to little weight because it was not from an acceptable medical source; "the error was harmless because the ALJ gave other good reasons, supported by substantial evidence, for the weight assigned to [the opinion]"). Thus, the salient question is whether the additional reasons provided by the ALJ constituted a sufficient basis upon which to discount Ruiz's opinions.

Having reviewed the record and the ALJ's decision, I conclude that the ALJ provided "good reasons" for his decision to accord "little weight" to Ruiz's opinions. In his decision, the ALJ explained that he discounted Ruiz's opinions because he found them to be inconsistent with the treatment notes prepared contemporaneously by Gonzalez-Cruz's treating sources, as well as the findings of the psychological consultative examiners, Noia and Brownfeld. (Tr. 29). The ALJ's decision discussed Ruiz's treatment notes at length.

Specifically, the ALJ noted that Gonzalez-Cruz had received mental health treatment for several years and that his prescribed medication was effective in decreasing his anxiety. (Tr. 25). According to the ALJ, Gonzalez-Cruz's mental status examinations generally found him depressed and anxious, but otherwise possessed of normal thought processes, intact memory, and fair or good concentration. (*Id.*). Gonzalez-Cruz's most recent treatment notes described him as having a normal affect. (*Id.*). Further, Gonzalez-Cruz's treating providers encouraged him to work, with one noting that he was "very resourceful." (*Id.*)

The ALJ also reviewed the most recent psychological consultative examination performed by Noia. (Tr. 27). According to the ALJ, the results of that evaluation suggested that Gonzalez-Cruz was able to understand and follow simple directions, perform simple tasks, and maintain attention and concentration for such tasks. (*Id.*). On the basis of the treatment notes and opinions discussed by the ALJ, he concluded that the significant limitations assessed by Ruiz were simply inconsistent with the record evidence.

On this record, I find that the ALJ did not violate the treating physician rule by determining to afford "little weight" to Ruiz's opinions for the reasons he explained. *See Scitney v. Colvin*, 41 F. Supp. 3d 289, 302-03 (W.D.N.Y. 2014) (ALJ properly discounted opinion of treating physician where the opinion was inconsistent with the record as a whole, including the opinions of state consultative physicians and claimant's testimony of daily activities); *Molina v. Colvin*, 2014 WL 3925303, *2 (S.D.N.Y. 2014) (ALJ did not err in declining to credit opinion of treating physician where the "opinion was contradicted by 'other substantial evidence in the record,' including two other doctors' opinions"); *Atwater v. Astrue*, 2012 WL 28265, *4-5 (W.D.N.Y. 2012) (ALJ properly found treating physician's opinion inconsistent with record as a

whole where opinion conflicted with opinions of state agency medical consultants and was

inconsistent with claimant's reported activities), *aff'd*, 512 F. App'x 67 (2d Cir. 2013).

In any event, the ALJ's RFC assessment was supported by substantial evidence.

The record reflects that although Gonzalez-Cruz engaged in long-term mental health and

chemical dependency treatment, he generally remained stable with medication and therapy. His

therapy sessions focused primarily on everyday stressors, such as conflicts with his girlfriend,

and his struggle to maintain abstinence from alcohol and other substances. The treatment notes

repeatedly suggest that he engaged in work-related activities as frequently as possible, and that

he was able to manage daily activities, including living alone, cooking, cleaning, laundry, and

maintaining social relationships. (Tr. 60, 69, 453, 551, 598, 604, 641, 686, 753, 785, 787, 899,

909, 939). His treating psychiatrist opined that he was capable of engaging in work-related

activities, and several consulting physicians opined that he was capable of maintaining the

attention and concentration requirements of simple work. (Tr. 399, 425, 565, 754, 763). Further,

the ALJ recognized that Gonzalez-Cruz's mental impairments did cause limitations in his ability

to perform work-related activities, and the ALJ carefully accounted for the limitations supported

by the record in formulating the RFC. Specifically, the ALJ limited Gonzalez-Cruz to positions

involving simple, routine, repetitive tasks, simple work-related decisions, few workplace

changes, limited interactions with others, and no fast-paced production requirements.

(Tr. 24-29). I conclude that the ALJ's RFC assessment was reasonable and supported by

substantial evidence. *Pellam v. Astrue*, 508 F. App'x 87, 91 (2d Cir. 2013).

### C.     Step Five Assessment

I turn last to Gonzalez-Cruz's challenge to the ALJ's step five assessment.

(Docket ## 12-1 at 28-29; 15 at 7 n.5). First, Gonzalez-Cruz maintains that the ALJ erred in

relying on the vocational expert because the hypothetical posed to the expert was based upon a flawed RFC assessment. (Docket # 12-1 at 28-29). Because substantial evidence supports the ALJ's RFC determination, Gonzalez-Cruz's contention fails. *See Diakogiannis v. Astrue*, 975 F. Supp. 2d 299, 319 (W.D.N.Y. 2013) (citing *Wavercak v. Astrue*, 420 F. App'x 91, 95 (2d Cir. 2011) ("[b]ecause we have already concluded that substantial record evidence supports the RFC finding, we necessarily reject [plaintiff's] vocational expert challenge")).

In his reply, Gonzalez Cruz argues for the first time that the ALJ also erred in relying on the vocational expert's testimony because it was inconsistent with the DOT. (Docket # 15 at 7 n.5). Although the Court was not required to consider this argument because Gonzalez-Cruz failed to raise it in his opening brief, *see Jones v.* Astrue, 2013 WL 802778, *5 (E.D.N.Y.2013) (claimant's argument procedurally deficient when not raised in its opening brief) (collecting cases), I provided the Commissioner an opportunity to respond to this argument (Docket # 16), and accordingly will resolve this challenge on the merits.

According to Gonzalez-Cruz, the hypothetical posed by the ALJ to the vocational expert involved an illiterate individual who was unable to communicate in English. (*Id.*). Yet, the occupations identified by the vocational expert required general educational development ("GED") language level one, which includes the ability to read, write, speak simple sentences, and to recognize 2,500 words. *See* DOT 318.687-010, 1991 WL 672755 (2016) (kitchen helper); DOT 323.687-014, 1991 WL 672783 (2016) (cleaner, housekeeping); DOT 369.687-018, 1991 WL 673072 (2016) (folder); *see also* DOT app. C, 1991 WL 688702 (2016). Given the language requirements of the positions identified, Gonzalez-Cruz maintains that the vocational expert's testimony that an individual with the RFC assessed by the ALJ could perform the identified positions was inconsistent with the DOT.

SSR 00-4p provides that a vocational expert's testimony should generally be consistent with the occupational information contained in the DOT and "[w]hen there is an apparent unresolved conflict between [the testimony] and the DOT, the [ALJ] must elicit a reasonable explanation for the conflict before relying on the [vocational expert's testimony]." *See* SSR 00-4p, 2000 WL 1898704 (SSA 2000). "Accordingly, the ALJ has a duty to elicit a reasonable explanation for any 'apparent unresolved conflict' between the [vocational expert's testimony] and the DOT, and to explain the resolution of the conflict before relying on the [testimony] in the decision." *Barone v. Colvin*, 2016 WL 4126544, *11 (S.D.N.Y. 2016).

I agree with Gonzalez-Cruz that there is an apparent conflict between the GED requirements contained within the DOT descriptions of the positions identified by the vocational expert and the ALJ's conclusion that Gonzalez-Cruz was illiterate and unable to communicate in English. *See Herrera Sanchez v. Colvin*, 2016 WL 6518504, *6 (E.D. Cal. 2016) ("occupational evidence from the [vocational expert] was . . . inconsistent with the DOT" where the ALJ found that plaintiff was illiterate but the jobs identified by the expert all required the ability to read and write); *Guillen v. Colvin*, 2015 WL 2227845, *5 (C.D. Cal. 2015) ("[i]f the ALJ relies on a job description in the DOT that fails to comport with the claimant's language limitations, as happened here, the deviation must be explained"; "[w]hile an illiterate person is not per se disabled, . . . an ALJ must consider how a person's literacy level affects work-related functions"); *Linares v. Colvin*, 2014 WL 5528404, *5 (C.D. Cal. 2014) ("the DOT's *lowest* Language Development level, still requires, in part, the ability to read and understand the meaning of 2,500 words and speak simple, grammatically correct sentences[;] . . . [s]uch requirements are inconsistent with plaintiff's language abilities"); *Ryan v. Astrue*, 2012 WL 994635, *4 (C.D. Cal. 2012) ("vocational expert's testimony was inconsistent with the DOT's

language skill requirement" where the hypothetical posed by the ALJ involved an illiterate individual); *Xiong v. Astrue*, 2011 WL 3322828, *17 (E.D. Cal. 2011) (finding conflict between DOT and vocational expert's testimony where the positions identified required language level one, but the ALJ concluded that plaintiff was illiterate and unable to communicate in English). Further, I find the selective quotations from the cases cited by the Commissioner in its supplemental submission to be wholly inapposite. (Docket # 17 at 17 citing *Ferguson v. Astrue*, 2010 WL 7746198, *7 (W.D.N.Y. 2010) (possible conflict was explicitly addressed and resolved by vocational expert during the hearing) and *Zokaitis v. Astrue*, 2010 WL 5140576, *13 (D. Vt.) (addressing dispute arising from the ALJ's step four determination, not step five determination, and distinguishing cases involving disputes at step five), *report and recommendation adopted*, 2010 WL 5140063 (D. Vt. 2010), *aff'd*, 465 F. App'x 17 (2d Cir. 2012)).

The apparent conflict between the vocational expert's testimony and the DOT was not acknowledged by either the ALJ or the vocational expert; thus, no attempt was made to resolve the apparent conflict. Under such circumstances, the ALJ erred in relying on the vocational expert's testimony at step five, and remand is appropriate "for development of an adequate record addressing [Gonzalez-Cruz's] inability to communicate in English and the effect of [his] limited English communications skills on [his] ability to perform the unskilled jobs identified as otherwise appropriate and available for [Gonzalez-Cruz]." *See Kong v. Astrue*, 2011 WL 674048, *13 (E.D. Cal. 2011); *see also Herrera Sanchez v. Colvin*, 2016 WL 6518504 at *6 ("ALJ's failure to recognize the conflict and resolve it was error and one which the [c]ourt cannot find to be harmless"); *Guillen v. Colvin*, 2015 WL 2227845 at *6 ("the VE's testimony could not serve as substantial evidence supporting the ALJ's determination and it was error for the ALJ to rely on the VE's testimony in finding that plaintiff, in light of his assessed illiteracy in

English, can perform the jobs [identified]"); *Linares v. Colvin*, 2014 WL 5528404 at *5 ("the vocational expert's testimony, which the ALJ adopted, could not serve as substantial evidence supporting the ALJ's determination at step five"). On remand, if the ALJ determines that Gonzalez-Cruz "can perform the identified positions following testimony of the vocational expert, [he must explicitly] set forth his reasoning in determining that [Gonzalez-Cruz] can perform the work despite the discrepancy between [his] language skills and the DOT's level [one] language requirement for the jobs in question." *Kong v. Astrue*, 2011 WL 674048 at *13; *Buck v. Berryhill*, 2017 WL 4898515, *4 (D. Minn. 2017) ("[t]he [c]ourt therefore reverses the ALJ's decision at the fifth step and instructs the ALJ on remand to obtain additional vocational expert testimony to address whether the jobs [identified], or any other jobs existing in significant numbers in the national economy, can be performed within the limitations of [plaintiff's] RFC, including the limitation of 'no reading and writing'").

Gonzalez-Cruz originally applied for benefits more than seven years ago. Having concluded that a remand for further fact-finding at step five is necessary, I direct that "further proceedings before the ALJ be completed within 120 days of the issuance of [this order] and, that if the decision is a denial of benefits, a final decision of the Commissioner be rendered within 60 days of [Gonzalez-Cruz's] appeal from the ALJ's decision." *See Michaels v. Colvin*, 621 F. App'x 35, 41 (2d Cir. 2015); *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 355 (E.D.N.Y. 2010) ("because the ALJ here progressed to and completed step five of the five-step sequential analysis, the court may impose a time limit for the Commissioner to complete administrative proceedings on remand, including the issuance of a final decision"). **If the above "deadlines are not observed, a calculation of benefits owed [Gonzalez-Cruz] must be made immediately."** *Michaels v. Colvin*, 621 F. App'x at 41 (quotation omitted).

## <u>CONCLUSION</u>

For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 14)** is **DENIED**, and Gonzalez-Cruz's motion for judgment on the pleadings **(Docket # 12)** is **GRANTED** to the extent that the Commissioner's decision is reversed, and this case is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings consistent with this decision.

**IT IS SO ORDERED.**

_____
*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
March 14, 2018